JUDGE GREEN.
The land in dispute is 1,000 acres, part of a larger tract, patented on the 10th day of September, 1755, to James Christian, John Christian, and William Brown, for *3,926 acres. James and John Christian died before the year 1768, and Brown survived them; and they being jointenants, the title to the whole land, as the law then was, survived to him. On the 7th of September, 1768, John Christian, the son of the patentee John, and father of the lessors of the plaintiffs, gave his bond to John Edloe, for the conveyance of 1,000 acres of the said patent, to be laid off as Edloe should choose, so as not to interfere with the lands already laid off, and surveyed by James Higginbotham. On the 5lh of November, 1788, James Higginbo-tham surveyed and laid off these 1,000 acres, for the. heirs of Edloe. On the 19th of January, 1798, Alexander Edloe, heir at law of John Edloe, assigned this bond to John Christian, the nephew of John Christian, the obligor; who, in February, 1798, assigned it to the obligor, who was the father of the lessors of the plaintiff, and for whose benefit John Christian, the nephew, had procured the original assignment. On the 29th of April, 1774, the land so patented was, upon the petition of John and Charles Christian against William Brown, and the devisees of John Christian, and the devisees of James Christian, by an order of the General Court, lapsed for the non-payment of the quit-rents, and the lands declared to be vested again in the Crown. James Eondon’s deposition, taken September 23d, 1801, in a suit in Chancery, between John and Charles Christian against Reuben Norvell, states, that the land called John Christian’s, on the waters of Rocky Run, had been settled upwards of 45 years. That of Charles Christian, taken in'the same suit, May 18, 1804, states, that William Brown agreed with John Christian, the father of the lessors of the plaintiff, that if he would make John Edloe a good title to 1,000 acres out of the said patent, he would relinquish all his right in the said land, and never after did he lay any claim to the land. The witness states, that he ha'd no interest in the 1,000 acres purchased by Edloe. These 1,000 acres were charged for taxes to J. Edloe; and the taxes *were paid by John Christian, in the namp of Edloe, from the year 1782 to 1787, both inclusive, and for the years 1788 and 1789, without its being designated in the receipt on whose account the taxes were paid. This land, called Edloe’s, containing 1,000 acres, is the land in dispute, and was granted to Reuben Norvell, by three patents, bearing-date in October and November, 1797, upon surveys made in November, 1795, and February and March, 1796, and was settled by his tenant in 1802 or 1803; and held by him ever since. This was the first actual settlement made on that part of the land called Edloe’s; and no act of ownership over this part of the land is shewn, except that, in 1772, a person who lived adjoining the land, got some timber for building a tobacco house from that part of the land, by the permission of James Christian, who acted as agent of the owners, who were reputed to be the Christians of New Kent, but the witness knew not which. But, John Christian was reputed to have an interest; whether as sole claimant or not, the witness did not know. The land where the timber was gotten, was not then, but was afterwards, called Edloe’s. It is also proved, that, before the year 1770, there was an old settlement on a part of the patented land: that, John Christian, in 1773, claimed all the land not before sold; and, in the same year, Gossett took possession of the old improvements under John Christian, and that part of the land was af-terwards sold to Grissom by John Christian: that Henry Christian settled on a part of the said land, as the witness understood, claiming under John Christian, in 1776 or 1777, and resided there in 1788: John and Charles Christian, at whose instance the land had been lapsed, conveyed 933 acres of the lapsed land to Grissom, on the 30th of October, 1777, and 507 acres to Henry Christian, on the 9th of December, 1777, and 507 acres to Charles Christian of Goochland, on the 24th of September, 1778. The heirs at law of John Christian brought their ejectment, upon the case above stated, against *Whitting-ton, claiming under Reuben Norvell. The above was, in substance, all the evidence given. The demise is. laid on the first of January, 1795. The defendant moved the Court, to compel the plaintiffs to join in a demurrer to the evidence, which they resisted. But, the Court compelled them to join, and gave judgment for the plaintiffs.
*336 It is objected by the appellants, that the date of the demise laid in the declaration, being before the death of John Christian, and consequently before the title of the lessors of the plaintiffs accrued to them, they were then incapable of making a lease, and consequently the plaintiffs' action cannot be maintained, notwithstanding the act of Assembly which provides, that “after issue joined in ejectment on the title only, no exception of form or substance shall be taken to the declaration in any Court whatsoever;” the more especially as. by the common law, a judgment in ejectment is conclusive evidence of title, at the date of the demise laid in the declaration, in an action for mesne profits. The objection which is now urged was'considered in the case of Duval v. Bibb, 3 Call, 362, and over-ruled; and I think rightly. The object of the statute was to limit the defendant in ejectment, a'fter issue joined on the title only, to objections to the title only; so that, if the lessors of the plaintiff could shew a title at the time the suit was instituted, they were entitled to recover, notwithstanding any error in form or substance. The case of Butts v. Blunt, 1 Ran. 255, does not controvert this position. In that case, the evidence declared to be inadmissible had no tendency to prove any title in the lessor of the plaintiff. It was that title which was in issue, and to which the proofs of the parties were necessarily .confined. The objection was ■ not to the declaration, but to the proofs offered to shew a fee simple title in a person other than the lessor. It is true, that this construction of the statute and the rule of the common law referred to, cannot exist together. The consequence is, that the statute abrogates that rule of the common law in toto, and in an action for *mesne profits, the plaintiff may exhibit the judgment in ejectment as conclusive evidence of his title at the time of the institution of the action of ejectment, but must produce other proof to shew the commencement of the title established by that judgment.
On the part of the appellee, it is strongly insisted, that the Court erred in compelling him to join in the demurrer to' evidence tendered by the other party; and, the authorities shewing the original practice of the English Courts on this subject, have been brought to the attention of the Court, and ably commented on. From these it appears, that the former practice was, to require the party demurring to admit upon the record the existence of all facts, which the evidence offered by the other party conduced to prove. Those facts were to be ascertained by the Court; and in this respect, the Court might err in opinion, and if so, and the party refused to make the admission, he lost the benefit of his demurrer; or, if he made the admission on record, it bound him irrevocably. In the latter case, the error of the Court could never be corrected; and in the former, not without a protracted litigation, attended with great delay and expense, to wit: by bill of exceptions and appeal.
To avoid this inconvenience, the modern practice is, especially in Virginia, where it ■has been sanctioned by repeated decisions of this Court, to allow either party to demur, unless the case be clearly against the party offering the demurrer, or the Court should doubt what facts should reasonably be inferred, from the evidence demurred to; in which case, the jury is the most fit tribunal to decide; to put all the evidence on both sides, into- the demurrer; and then to consider the demurrer, as if the de-murrant had admitted all that could reasonably be inferred by a jury, from the evidence given by the other party, and waived all the evidence on his part, which contradicts that offered by the other party, or the credit of which is impeached; and all inferences from his own evidence, which do not necessarily *flow from it. With these limitations, the party whose evidence is demurred to, has all the benefit of the ancient practice which it was intended to give him, without subjecting the other party to its inconveniences; and no disputed fact is taken from the jury, and referred to the Court. I, therefore, think that the Court was right, in compelling the appellees to- join in the demurrer.
Upon the merits of this case, I feel some difficulties. The questions which arise in this case, have been twice discussed here; once in the Court of Appeals, and once in a Special Court of Appeals; and the decisions of those Courts respectively, (considering the division of the Judges in the last case,) nearly neutralise each other.
These questions seem to- arise in the case:
1. Whether the petitioners acquired, by the judgment of the General Court in 1774, any right which, connected with the possession, such as it was, enabled them to sustain an action of ejectment?
2. Whether the act of 1798, with a possession, such as it was, and the payment of taxes, gave to John Christian a title to the lands in question, upon which he could maintain an ejectment? and this last question will be materially affected by the question,
3. Whether the lands in question, after the establishment of the Land Office, were liable to be located by virtue of a Treasury Warrant? and if not,
4. Whether, nevertheless, the legal title of the Commonwealth passed to Norveli by the grants made to him?
These questions involve an inquiry into the general outline of the land laws of Virginia, affecting this question, both before and since the Revolution.
During the Royal government, the lands belonged to the Crown, and were granted by the Governor, with the approbation of the Council, according to such methods and instructions as were, from time to time, prescribed and given by the King in Council. It is impossible now, in consequence of the destruction of the public records, during *the Revolution, to ascertain what were the rules thus established, in all their details. But, a pretty full outline may be gathered from the forms of patents, as they are regis *337 tered — our acts of Assembly — the remaining fragments of the Council books, and the decisions of the Court of Appeals, since the Revolution, in which the ancient practice upon this subject is occasionally referred to. Notwithstanding the granting of lands belonged exclusively to the Governor and Council, under the direction of the King in Council, (3 Hen. St. at Lar. p. 353,) yet the acts of the Colonial Assembly, when sanctioned by the Crown, operated as limitations oil, and modifications of those instructions.
During the government of the Virginia Company, no reservation or condition was annexed to the grants, except a reservation of a quit-rent to the Company. But, soon after the charter of the Company was seized into the King’s hands, we find that the patents had not only the usual reservation of quit-rents, but also the following proviso: Provided, that if the said A. B. shall not plant and seat upon the said land, within the term of three years now next ensuing the date hereof, that then it shall and may be lawful for any adventurer or planter to make choice of, and seat upon the same. (Patent Book, 1636, February 3.) And this continued to be the form of the patents until 1710. Not only might any other enter land not patented and seated according to the proviso of the patent, as if it were vacant, but in 1644 it was enacted, that lands deserted after they were settled, might be taken up and patented as deserted, by any other. But, in 1657 it was enacted, that no patent should thereafter pass, upon pretense that the land was deserted for want of planting within the term of three years, unless an order be first granted by the Governor and Council for that second patent, whereby the land is adjudged so to be deserted, and, that the first petitioner for deserted land shall not be denied to have the first grant. In 1661, this act was re-enacted, *with the addition of a provision that the first petitioner should have the preference, "he making his rights,” (that is, charter or iniportatipn rights,) “appear when he petitions for the land.”
In 1699, (see Council Order Book, January 4, 1699, 1700,) new instructions addressed to Governor Nicholson, as to a new method of granting lands in Virginia, were received, the particulars of which cannot be ascertained, as they are not extant. But, it appears, that in this year began the practice of granting lands, upon consideration of composition money paid to the Receiver General; and, that all questions as to the priority of entries for vacant land, rvere decided by the Governor and Council upon caveats. (See back of Council Order Book, letter of August 33, 1706, containing an explanation of the then method of taking up lands.) In 1705, an act was passed “concerning granting, seating and planting of lauds, &c.” which Mr. Hening has published as omitted by mistake in the revisáis of 1733 and 1753. But, it vras not published, because it was never in force; for the Queen disallowed that act and the act of 1666, declaring what is meant by seating of land. (See Orders in Council, October 34, 1711.) New instructions were given under date of March 1, 1709-10. (See back of Council Book.) And in 1710, an act passed, probably conforming to those instructions, declaring that lands should be forfeited for failure to pay quit-rents for three years, and providing that no patent should be granted for lands forfeited for want of seating and planting, or for not paying quit-rents, until judgment and certificate obtained from the General Court; which could only be had upon a petition to the Governor, and filing a copy of the petition in the Genera] Court; whereupon the party should be summoned, and thereupon the Court might declare the lands forfeited and again vested in the Crown, and certify to the Governor that the prosecutor was the first petitioner, and had prosecuted his petition with effect; which certificate shall entitle the party obtaining the same, to have a ^patent for the same lands, in the same manner, and under the same restrictions and provisoes, as lands not before patented; and if there shall happen to be a greater quantity of forfeited land than shall be granted to the first petitioner, then the residue of such land, so forfeited, shall be granted to such other person or persons as shall petition for the same, under the like restrictions and provi-soes, and in the same manner as lands not before patented shall be granted. This act was re-enacted in 1748, with some variations in the words, not. affecting the construction of the act; and this latter act was in force until the Revolution. After the act. of 1710, the patents had a proviso, that if the quit-rents were in arrear for three years, or the land were not cultivated and improved at the rate of three acres for every fifty, within three years, the land should be forfeited; “and thereafter it shall and may be lawful for us, &c., to grant the said land to such oilier persons as we, &c., shall think fit.” (Patent Book, December 13, 1710.) In 1713, other instructions were received. (See last Order in Council, April 33d, 1713,) which probably varied considerably the former method of granting lands. I am confident, that these, or some preceding instructions, limited the right of taking up vacant lands at the pleasure of the party, and without the express order of the Governor and Council, to 400 acres in one tract. The act of 1705, which was disallowed by the Queen, attempted to fix the maximum of locations at pleasure, and without the authority of the Governor and Council, at 500 acres; and in my examination of old titles, I have observed, that after this period, the same person has procured, on the same day, several patents for 400 acres each, all adjoining and forming one compact body. There are also great numbers of orders on the Council Books, authorising individuals to take up larger quantities of land, invariably reciting, that the party had proved to the Governor and Council, his ability to seat and cultivate the same. And the act. of 1779, for adjusting and settling titles, &c., recognizes *as valid, entries upon warrants “with the surveyor of the county, for tracts of land not exceeding *338 400 acres, according to act of Assembly.” But I cannot find the act of Assembly alluded to.
An order of Council, of October, 1723, authorises lands entered and surveyed to be taken up by others, unless carried into grant within six months.
Before 1661, a party desiring to take up lands, might first have a survey made, and .then, upon producing a certificate that he had proved his rights (charter or importation,) for the quantity of land in the survey, or proving them before the Governor and Council,' might take out a patent, (1642, chap. 68.) But, in that year, it was enacted, that such rights should be _ first proved, before any survey be made, “itbe-ing unreasonable that others, furnished with rights, should be debarred by pretense of survey, which, in itself, is no title.”
In the Council Book, p. 112, June 11, 1724, there is an order dismissing a caveat, “because the plaintiff had no pretentions to the land;” and, in the same book, March 6th, 1781, is the following order: “on the petition of George Woodruff, setting forth, that 400 acres of land in Caroline county were, about three years ago, granted by order of the General Court, as lapsed, to John Martin, who hath not sued out a patent for the same, praying for a grant thereof; it is ordered, that the said Martin do attend this board the next Court of Oyer and Terminer, to shew cause why the said land may not be granted to the said petitioner.”
I observe too, that the patents for lapsed land invariably recite the original grant; the condition as to the payment of quit-rents, and cultivating and improving; the failure of the original grantee to do so; and that the last grantee, or his assignor, “hath made humble suit to our Governor and Commander in Chief of our said Colony and Dominion, and hath obtained a grant for the same;” and then recites the rights upon which the last grant issues, as for instance, compensation money paid to the Receiver General.
There is an order in the Council Book, of November 16, 1711, which shews the method of proceeding, after the judgment of the General Court, declaring the lands forfeited, and the title re-vested in the Crown. This order was after the act of 1710, which was in force at the commencement of the Revolution, and shews that an inchoate right to the pre-emption was vested by the judgment of the General Court, but forfeited by the allowance of the petition (previously filed,) by the Governor and Council: that the judgment and certificate of the Court was the conclusive evidence upon which- the petition was allowed; and that the composition money was paid, or rights produced, not before, but after the allowance of the petition; and the payment or production of which was one of the conditions on which the patent was to issue. The form of patents for lapsed lands indicates the same. It is in these words: “On the petition of Augustine Smith, for a grant of 400 acres, found lapsed from Edward Buckley, of the county of Essex, for the want of seating and planting, certificate being produced from the General Court, that the said Augustine Smith is the first petitioner for the said land, and hath prosecuted the same with effect, it is ordered, that a^ patent be prepared for granting the said land to the said Augustine Smith, upon the conditions mentioned in her Majesty’s instructions.” There are many similar orders on the Council Books, in the same form, and to the same effect.
I observe, also, that there is an order in the Council Books, (October 31, 1723,) directing surveyors of the frontier counties “to- give public notice, at the Court-house, of the lapse of all such grants or entries as they shall know to be now void by law, and the present orders of the government; and that they then receive entries in common form, from any person desiring to take up any part of said lands.” This regulation was partial, confined *to the frontier counties, contradicted the provisions of the act of 1710; and, if it ever had any force, was abrogated by the act of 1748, which prescribed the manner of acquiring lapsed lands.
In May, 1776, an ordinance of the Convention declared, that all acts of the General Assembly of the Colony, then in force, should continue in force.
From these materials, and what appears in the case of Wilcox v. Calloway, 1 Wash. 38, and other cases in the Court of Appeals, I gather, that lapsed lands were originally liable to be taken up at the pleasure of any other, i-n the same manner as other vacant lands: that this right was afterwards restrained, and they could only be acquired upon a petition to the Governor and Council, and upon a judgment of forfeiture: that this judgment was originally given by the Governor and Council, and afterwards by the General. Court: that, originally, the petitioner was bound to produce rights, sufficient for the whole or a part of the land when the judgment of forfeiture was pronounced; and that any petitioner for the residue, not taken by the first petitioner, must also produce his rights, when he petitioned for the land: that this ‘ was dispensed with by the acts of 1710 and 1748; and that the petitioner might take the land, upon the restrictions, or, (in the terms of' the act of 1748,) upon the “conditions” and provisoes, upon which un-patented land was granted: that those restrictions (or conditions) and provisoes, related to the consideration to be paid, and the form of the grant, and not to the manner of proceeding, for procuring' the grant; for, that manner was, by the act of 1748, strictly confined to that by petition to the Governor and Council; whereas, the manner 'of procuring grants for unpatented lands was by entry with the surveyor and survey, or by survey under an order of Council: that the first or any subsequent petitioner forfeited the right thus acquired, by failing to comply with those conditions; that is, of producing rights, and taking out a patent, within six months after the allowance of his *petition; as in the case of an entry and survey of unpatented land in ordinary cases, *339 the claimant forfeited his right, unless he took out his patent within six months after the return of the survey; and upon the same policy, and for the same reasons, and in pursuance of the terms of the acts of 17J 0 and 1748: that such forfeiture of the rights of the first, or any subsequent petitioner, could not be taken advantage of, but by a subsequent petition, and the judgment of the Governor and Council thereupon; as the forfeiture of an entry and survey could only be taken advantage of, by a subsequent entry and survey; and, in those •cases respectively, the party originally entitled could take out his patent, at any ■distance of time, if no other party had acquired a right: So that the right to sue out the patent subsisted, until defeated as aforesaid. And this resulted, in the case of lapsed land, from the provision of the statute, that such lands should not be granted, but to a petitioner, and to him, on the conditions upon which unpatented lands were granted. That this was the settled and practical construction of the law, appears from the cases decided in this Court, and will appear from examples hereafter cited; and it appears from the order of Council of the 6th of March, 1731, not only that lapsed lauds could not be taken up as unpatented lands, (for, if they could, as the quantity of lands petitioned for in that case, did not exceed the quantity for which any owner of rights might enter with the surveyor ad libitum, there would have been no necessity for a petition in that case;) but that the mere petition did not, before it was allowed, destroy the right' of the first petitioner. For, he was summoned to shew cause against the petition; and, I suppose, that there were excuses for not taking out the patent, which would have saved his right, as that he was prevented from taking it out by fraud or accident. Otherwise, the summons to shew cause would have been idle. If the only object of the summons was to enable him to shew that he had actually taken out a patent, then the certificate of the Secretary would have effectually decided that question one way or the other.
*1 conclude, therefore, on this point, that the petitioners acquired, by the successful prosecution of their pe tition, not a right in or to the lands in question, so as to give them a right to enter thereon; but, a right to sue out a patent, upon producing rights sufficient to cover the quantity of land lapsed, that is, a right of pre-emption: that this right could not be lost, unless by a subsequent petition prosecuted with effect, and still subsists, unless the subsequent statutes have taken it away, or unless the patents to Norvell have destroyed it; and that the lands in question were never liable to be taken up upon Treasury Warrants, or on any other rights by entry and survey, as vacant lands, unless so made liable by statute subsequent to the judgment of lapse, pronounced in the General Court. The petitioners have never abandoned their right, such as it was, but having continually asserted it, by claiming the property, and paying taxes upon it for several years. Indeed, they seem to have treated this property rather as their inheritance than as a new acquisition; and, from the evidence, it is probable, that the proceeding for procuring the judgment of forfeiture, was with Brown’s assent, and resorted to as a means of transferring his title to the Christians, in consideration of their assuring to Edloe 1,000 acres, to be chosen by him.
This brings us to the enquiry, whether the acts of 1779, chap. 13 and 13, (the only statutes which are alledged to have had that effect,) authorised the taking up of this land as waste and unappropriated, under a Treasury Warrant, or any other rights, and by entry and survey. The professed object of the 12th chapter was, to settle all claims to unpatented lands under the former and present governments, and professes to establish certain rules for settling and determining the rights to such lands, and fixing the principles upon which legal and just claimants shall be entitled to sue out grants, to the end that subsequent purchasers and adventurers may be enabled to proceed with greater certainty and safety. In pursuance of this professed ^object, it proceeds to provide for claims to waste and unappropriated lands, allowing some as valid, and declaring others to be void; thus using the words waste and unappropriated as synonimous with unpalented; and the latter as equivalent to “not before patented,” used in the laws of 17J0 and 1748. The whole object of this act was, to settle the rights to such lands, so that subsequent purchasers of such lands might proceed with more safety. Accordingly, it makes provision for all cases, in which unpatented lands could have been claimed by entry and survey under the former government, and for no others; such as claims to lapsed or escheated lands. It provides, that all surveys of waste and unappropriated lands, made upon any of the Western waters, at any time before the end of that session of the Assembly, should be good, if made regularly, and founded upon either, 1. Charter rights; 2. Importation rights; 3. Treasury rights, for money paid to the Receiver General, upon entries not exceeding 400 acres, according to Act of Assembly; 4. Upon any Order of Council or entry upon the Council Books, remaining in force; 5. Upon any warrant of the Governor for military service, under proclamation of the King. All these were declared to be valid, and all other surveys were declared to be void. As to claims not then surveyed, it provided that, i. Claims under Governor Dinwiddie’s proclamation, under specified circumstances; 3. Claims under importation rights; 3. For composition money paid; and, 4. Proclamation Warrants for military services, under certain circumstances, should be valid, and might be located and surveyed, as provided for Treasury Warrants, by the 13th chapter; and that all entries for tracts not exceeding 400 acres with a surveyor, might be surveyed and carried into grant. It provided, that when surveys had been regularly made, under entries with a surveyor, or order of Council, or entry in the Council *340 Books, and the rights had not been before filed with the Secretary, the claimants might pay the composition money, and *take out grants. It provided for settlement rights; and that all orders of Council or entries for land in the Cotincil Books, except so far as such orders or entries respectively had been carried into execution by actual survey, should be void. This act provided for all possible claims for land under the former and present government, (by confirming or avoiding them,) which, according to former laws, were capable of being acquired by means of an entry or survey; but did not affect any other claims in any way. The former laws were still in force, which prohibited the acquisition of lapsed lands by entry and survey; and as to that class of claims, they .were left as they were under the former laws. This, I think, is the just construction of the 12th chapter; but, the 13th chapter, which is, in effect, a part of the same act, leaves no doubt upon the subject. That act, after abolishing the reservations of mines and quit-rents, and the conditions annexed to former patents, provides, that “no petition for lapsed land shall be admitted or received for, or on account of, any failure or forfeiture whatsoever, alledged to have been made or incurred after the 29th day of September. 1775;” and that “so much of all former acts of Assembly, as concern or relate to the entering, taking up, or seating lands, or direct the mode of proceeding in any case provided for in this act, shall be and are hereby repealed.” The Legislature then permitted petitions for lapsed land to be thereafter .admitted, provided the forfeiture incurred before September 29, 1775. It made no provision as to the mode of proceeding upon such petitions, and consequently left all the consequences of such petition to the former laws, which were not repealed in that respect, by the act of 1779, not coming within the terms of the repealing clause; such a proceeding having the effect of acquiring to the petitioner the title of the former owner, upon his performing the requisite conditions, and not being an entering, taking up, or seating of lands; and the statute having provided no other than the former mode of proceeding, *to procure such title. This was the cotemporaneous construction of those statutes; for, vast numbers of petitions for lapsed land were prosecuted and disposed of in the General Court, up to 1782 and after; and Mr. Jefferson, as Governor of Virginia, in 1780, issued many patents for lapsed land, precisely in the ancient form, (omitting the reservations and conditions,) and upon consideration of the ancient composition in money. (See two patents of. July 20, 1780, to Thompson and Preston,' and one of the same date to James White, in the Patent Book in the Register’s office.) The last of these patents were issued on a judgment of the General Court, pronounced April 25th, 1774, four days before the judgment in the case of Christians v. Brown.
The lands in question, therefore, were never liable to be taken up as waste and unappropriated, under a Treasury Warrant, or any other right; and", if, the petitioners or their representatives had, at any time after the . grants to Norvell, sued out a patent for the lapsed land, as they had a right to do, until another petitioned for the land, (unless prevented by the act of 1798,) that patent would have given them title from the date of the patent to Brown and the Christians, and have over-reached the patents to Norvell, according to the settled law as repeatedly stated in this Court. The petitioners have not, to this day, lost the right to sue out a grant. For, the act repealing, on the 1st day of January, 1820, all acts not published .in the last Revised Code, has a proviso, which declares, that such repeal shall not impair any right, accrued before the said 1st day of January; but such right may be maintained and asserted in the same manner as if this repealing section had never passed. This right was not jus in re, nor jus ad rem, so as to give a right to enter and possess the land; but, still it was a legal right to acquire a title, upon paying the composition and taking out a patent. . And this right was preserved by the terms of the last mentioned statute, which ought to receive a liberal con-structibn, for the preservation *of all rights then existing, no matter of what nature. The sole object of that repealing clause seems to have been, to prevent the acquisition of new rights, under laws little known or understood, and seldom in use.
This right of the petitioners to acquire a title to the land, did not give them any title to the land, legal or equitable. Their entry on the lands was as utterly unjustifiable, and as wrongful an intrusion on the possession of the Crown and of the Commonwealth, as the entry of any stranger would have been; and I think that no length of such possession could enable the possessor to maintain an- action of ejectment against any one claiming under the Commonwealth, unless a patent could be presumed; that the maxim of nullum tempus would apply, in its fullest extent to such a case; and that such a possession could not enable the party to maintain an action of ejectment against a mere wrong-doer, since the defendant, shewing that the title and right of possession were in the Commonwealth, would present as effectual a bar to the action of ejectment, as if he had shewn a title and right of possession in any other; and, if an ejectment could not be maintained upon such a possession of one year, neither could it be maintained upon such a possession of 26 years. Such a possessor, if evicted, could only reclaim the possession by a warrant of forcible entry and detainer. It would follow that the plaintiffs could not, in this case, maintain their action of ejectment, unless the Commonwealth had a legal title, notwithstanding the patents to Norvell, which she could riot vest in John Christian, or any other, and unless .she did, by the act of 1798, actually vest such legal title in him; or, unless the relinquishment of the Commonwealth’s title by that act, precluded *341 the defendant from availing himself of the Commonweal Ill’s title and right of possession, previously existing, to bar the plaintiff’s action, even although the title of the Commonwealth did not thereby vest in John Christian.
*1 have already said, that lands which had been once patented and lapsed were, according to the laws in force when Norvell’s patents issued, not liable to be located am! patented as waste or unappropriated; and that those patents isstted illegally, Til lands are waste and unappropriated, which have not before been patented. They were not, according to law, appropriated in the sense of the sí titule, by entry and survey; and as to such lands, the first patent passed the title •of the King or the Commonwealth, and none who had a merely equitable title, or inchoate right, by entry or survey, could assert it at 'aw against such legal title. The law authorised the acquisition of the legal title to such lands, by entry and surrey. But, as to lands once appropriated by patent and lapsed, no title could be acquired by entry and survey. They were expressly reserved to be granted in a specified mode; and a patent sued out in any other mode, was merely void. The Commonwealth did not hold lapsed land, by the general title, by which she held lands which had never been granted; but, the title of the patentee was re-vested in the King, or the Commonwealth; so that a new grant thereof passed to the grantee all the rights of the original patentee, and such new grant over-reached, as is stated bv the Court ill Wilcox v. Calloway, any intermediate patent. This ascertains that such intermediate grant, obtained by entry and survey, was not considered as passing any title, or precluding the King or Commonwealth from making a new grant, effectual for passing the title of the original patentee. The Commonwealth, therefore, in 1793, could vest in John Christian, or any other, by patent or otherwise, as the law might prescribe, a perfect legal title to the land in question, notwithstanding the pateáis to Norvell, and which should over-reach those patents, by vesting in the grantee the title of the original pat-entee. It only remains then to enquire, whether the act of 1798 did vest the legal title to the land in question, in John Christian, or precluded Korvell from asserting the title of the Commonwealth, as a bar to'this action.
*That act provides, that no entry or location on any lands in this Commonwealth, which shall have been settled 30 years prior to the dale of such entrj- or location, and upon which quit-rems or taxes can be proved to have been paid at any time within the said 30 years, shall be deemed valid; and any title which the Commonwealth may be supposed to have thereto, (“thereto,” that is, to any lands settled 30 years, &c.) is hereby relinquished. This act shall not extend to any entry or location, regularly made according to law, previous to the passing of this act. It appears, from the evidence in this case, that the tract of land granted to the Christians and Brown, was settled by the patentees, more than 40 years before the passing of that act. The settlement upon it operated as a settlement of the entire tract. In 1773, pending the petition in the General Court, John Christian look possession, probably in pursuance of the agreement with Brown, mentioned in the deposition of Charles Christian. After the patent lapsed, and before the land was sub-divided, that settlement was occupied by the petitioners, and that occupation constituted a possession of the whole tract, which, being once vested, continued in contemplation of law, as to the whole tract, until defeated by the actual entry of another; or by a transfer by the petitioners of their claim or right to another, which would carry with it their possession.
The right of a petitioner for lapsed land, was assignable in part or in whole, as appears from many patents to assignees in such cases, reciting the assignments, hi the case at bar, this possession of the petitioners and those claiming under them, was not interrupted or disturbed by the surveying or patenting of the land. The surveys were not made with intent, on (he part of Norveli, then to take any possession of the laud; nor did the patents, which issued in pursuance of those surveys, give him any seisin or possession, since no title passed thereby, and a patent only gives seisin as a consequence of its giving title. This possession .continued uninterrupted until 1803, as to the 1,000 *acres in controversy, when a person claiming under Norvell’s title, entered Upon these 1,000 acres, taxes were paid for several years, commencing with (he year 1782. Thus, these 1,000 acres were settled more than 30 years before the passing of the act, being- part of a larger tract (hen settled, and taxes were paid upon it: so (hat it falls within the provisions of (he statute. Was this possession the joint possession of John and Charles Christian, or of John only? Before the year 176S, when John Christian, in pursuance of his agreement with Brown, gave his bond to Edloe for the conveyance of the 1,000 acres in question, it seems that Higginbotham had made some divisions and surveys of the 3926 acres of laud, for what purpose does not certainly appear, but probably for distribuí ion amongst the representatives of the Christians. T am induced to think so, because 'two of that name obtained deeds from John and Charles Christian for precisely the same quantity of the land, 507 acres; the one, in 1777; the other, in 1778. When John entered info the possession of the land in 1773, he probably entered ill consequence of the pen-dency of the petition, and the assurance that it would not be opposed; and, as he and Charles were the petitioners, it is probable that he entered, as well on behalf of Charles, as for himself. At all events, after the judgment of the General Court, they held jointly, as is proved by their joint conveyances to several persons. The last of those conveyances proves, that at that time, Charles and John had either divided the land and held their respective *342 proportions in severalty, or that Charles had been satisfied for his interest out of the sale to Gresham, which is, I think, the fair inference. For, that deed states, that the land conveyed was bounded by the lands of John Christian. 1,000 acres belonged virtually to Edloe; 933 had been conveyed to Gresham; and 1,014 to the two Christians, leaving 979 acres, which were probably those called in the deed John Christian’s; so that it is probable, that Charles had abandoned all claims to, and possession *of, the land. However this may be, Charles was bound in equity as well as John, to make good 1,000 acres to Edloe, and when that land was, in 1788, laid out by John Christian for Edloe, Charles Christian assented to it. For, he says, he had no interest in that part of the land; ' and the joint possession of Charles and John, or the several possession of John, however that possession was, thereby passed to Edloe, and continued in him, until he transferred it again, in January, 1798, to John Christian, the father of the lessors of the plaintiff, through the agency of John Christian, his nephew. The several possession of John Christian may be dated at the time of that survey; he claiming under Edloe, who was then possessed, and indeed may be dated as far back as he and Charles held jointly; for, his several possession is claimed regularly, from and under that joint possession. I am inclined to think, that the act of 1798 did not vest the Commonwealth’s title in any one; but, the Commonwealth, abandoning her title, left the party having the best possessory right, as against all others than the Commonwealth, to enjoy the property. Such a right might be acquired, even to lands belonging to the Commonwealth, to be vindicated by warrant of forcible entry or detainer, though not by ejectment or writ of right; even although the party and those under whom he claimed, might have been possessed for more than fifty years. On the other hand, such a possession might be defended in an action of ejectment against any one not having a legal title. If the statute vested the Commonwealth’s title in any one, it must have been either in him, who, at the passing of the act, had a good possessory right to the land, against all others than the Commonwealth, (in which case, John Christian’s title under the act, would be good against all the world, as none could eject him, at that time, by any proceeding;) or, in him, who had made the settlement, having or claiming title, or those claiming under him; in which case, Brown, the surviving patentee and those claiming under him, would *be entitled under the statute. But, in that case, those claiming under Brown could not, at the time when John Christian’s heirs were evicted, have asserted any right against them in any pos-sessory action. The statute has a proviso, that nothing in that act contained, shall be construed to alter or change the construction of the act for the limitation of real actions; that is, not to exempt those claims from the operation of the statute of limitations, which would have been affected by it, if they had been originally valid and legal. John Christian, or John and Charles entered, in his or their own right, either under contract with Brown, or adversely to him; and in either case, their possession continuing until 1803, and being adverse to Brown and those claiming under him, they could not have been then evicted upon his-title, in any possessory action. He and those claiming under him, had lost the-right of entry by lapse of time. But, if, according to my view of the construction of the statute, the Commonwealth’s title was vested in no one, but the right of possession was the only right which could be asserted under the statute, then the defendant could not, in this action, set up against the plaintiffs the possessory right of Brown or his representatives, that being barred by the statute of limitations. Nor could he oppose to them the title and right of possession of the Commonwealth, that being relinquished by the statute, and no longer existing, if not vested in John Christian. And, although it should be admitted, that the possession of Christian, and his heirs, was rightful as to the Commonwealth only for five years before the-latter were evicted, yet such a rightful possession, even for a day, would be a. good title in ejectment, against any person who evicted him or them, who could not shew in himself or some other, or in the Commonwealth, a subsisting right of entry as against the'lessors of the plaintiff, at the time of the institution of the suit. The entries, surveys, and patents, issued in pursuance of them to Norvell, do not come within the proviso of the act of 1798; for, *they were not regularly made according to law. The judgment should be affirmed.
JUDGE COALTER.
The land in controversy is part of a tract of 3,926 acres, for which a patent issued in 1755, to James Christian, John Christian, and William Brown. The Christians died before 1768, leaving Brown, the surviving patentee. This land had been seated and improved pretty extensively, probably soon after the date of the patent; for, in 1770, the improvements were of ancient date. It would seem, that Brown did no’t wish to avail himself of his right of survivorship; for, he agreed with John Christian, son of the patentee of that name, that if he would make a title to John Edloe for 1,000 acres, he would abandon all claim., John Christian, accordingly, in-1768, gave his bond to Edloe, to convey 1,000 acres, part of the patent land aforesaid, to be laid off any where he might choose, not interfering with prior surveys made by Higginbotham.
We hear nothing more of Brown, or of his rights, except so far as regards Edloe’s claim under him for the 1,000 acres, which-have ever since been recognized by the Christians as a valid and just claim.
Whether the Christians generally, or John alone claimed this land, up to the time of filing the petition herein-after mentioned, is not very apparent. One witness says, that in January, 1773, he went to *343 New Kent, where John Christian resided, to purchase some of the land, understanding that he claimed all the said patent land then unsold. About the year 1770, one James Christian was understood to be the agent of the owner or owners, and one Cosset was in possession of the improvements as tenant. The witness, who speaks of these matters, says he understood, that John Christian, father of the lessors, was a claimant, but whether a sole owner or not, he does not recollect. The probability is, that John Christian then ^claimed the whole, by virtue of this agreement with Brown, but that possibly, in order to quiet the representative of the other deceased partner, or in consequence of some general family arrangement, resort was had to the petition herein-after mentioned, as a species of conveyance, so as to quiet every thing. The object of this petition could not have been adversary to Brown, so as to defeat his rights, and those of Edloe, claiming under him, by virtue of the agreement aforesaid; because, by that agreement, Brown had abandoned his claim, and never thereafter alledged any claim to the land; and John Christian became bound to Edloe for the 1,000 acres. A further proof of this may be derived from the two deeds executed in 1777 and 1778, by John and Charles Christian; one to Henry Christian, and the other to Charles Christian of Goochland, for precisely the same quantity of land, viz: S07 acres each.
Under this family arrangement, as I take it to have been, John and Charles Christian petitioned for this land as lapsed for the non-payment of quit-rents, and on the 29th of April, 1774, a judgment of the General Court is entered in their favor, against William Brown, and certain persons named as devisees of John Christian and Charles Christian, the deceased pat-entees, they being summoned, and not appearing, &c.
William Brown having taken by surviv-orship was, in truth, the real defendant; but, no defence was made by any one; and, under the agreement with Brown, John Christian, one of the petitioners, was in fact the claimant of the land. Soon after this judgment, a conveyance was made by the petitioners to Gresham, for 933 acres of the land, it doubtless having been sold to him before; and this deed has reference to that judgment, and soon thereafter, the deeds for the 507 acre tracts were also executed, as above stated.
From this time forward, Edloe’s claim to 1,000 acres is recognized, though its precise location had not as yet been *made. Gresham was possessed, by his purchase, of that part of the tract, containing the ancient improvements aforesaid. Taxes are paid on Edloe’s 1,000 acres for the years 1782, ’83, ’84, ’85, ’86, and ’87. These taxes were paid by men of the name of Christian, for Edloe. At wdiat time he died, does not appear; but, in 1788, John Christian had the land surveyed for Alexander Edloe, heir of John, from whom he, John Christian, afterwards purchased. This purchase was made in 1798. In 1790, there is a receipt of the Sheriff for 2l. 15s. 5d. to be applied to John Christian’s (of New Kent,) land tax for 1788-’89.
The land now in controversy is the land so laid off for the heir of Edloe, and purchased by John Christian, as aforesaid.
The defendants are in possession, and claim this land under three patents, issued to Reuben Norvell, by Land Office Treasury Warrants ; the survey, in one case, being on the 27th day of November, 1795; in another, on the 8th of February, 1796; and, in the other, on the 4th of March, 1796. The patents bear date in October and November, 1797.
The first enquiry will be, whether the plaintiff can recover in this action, independent of the act of .1797, chap. 10, which passed on the 24th of January, 1798?
Secondly, if not, whether that act protects them?
If the decision of this Court in the case of Norvell v. Camm, reported in 2d Munford, 257, is law, then it would seem to me that the judgment in this case can be supported, on that ground.
It was contended, in that case, that Nor-vell stood at least on as high ground as the lessee of the Commonwealth; and, as time did not run against the Commonwealth, it would not affect him. This might have been the case, had this land been vacant or unappropriated; but, it was patented land, the title to which had been re-vested in the Crown, under the act, not absolutely, as I apprehend, as in *case of escheat after office found, but sub modo; that is, subject to be re-granted to the first or some subsequent petitioner, and to no other person; in which way alone, it seems to me, could the title, so vested in the Commonwealth, pass, at least under existing law's. The laborious researches of the Judge who has preceded me, seem satisfactorily to prove, that the title may, until a very late day, and perhaps even yet, be acquired in that way. That title, thus circumstanced, is now in the Commonwealth.
The possession of Brown, and, after him, of the Christians, or one of them, for their benefit, and that of Edloe, who claimed under Brown, up to the date of 1he judgment of the General Court, was a possession of patented lands; and their possession of the whole tract, after that judgment, until parts thereof were conveyed, and af-terwards of the residue, for the benefit of Edloe, and themselves, continued down to the ouster by Norvell, or those claiming under him. Had they obtained a patent of subsequent date to that of Norvell, it would have had relation to the original grant to the Christians and Brown, and would have over-reached Norvell’s, though prior in date.
The Commonwealth, then, had a right to make a grant after that to Norvell, which would have vested a paramount title at law, and under which, the patentee could have ousted him. Norvell then would rather seem an intruder on the rights of the Commonwealth, than as entitled to stand as her lessee. On the contrary, the petitioners having, at their expense, per *344 formed meritorious services, by thus throwing open this land to a re-sale, as aforesaid, and having thus paid in part the consideration, and even at this day probably having a preference over all the world to call for this legal title, on the payment of a small sum,, as composition money, would more properly occupy the ground of lessees of the Commonwealth.
The legal title, then, which, considering the small amount to be paid by the petitioners, in order to entitle them to it, may be considered almost a naked outstanding title, or ’Hrust for their benefit, stands in a very novel situation, unprecedented at common law, and, as to its legal effects on the parties, must depend on the peculiar phraseology and construction of the act.
It seems to have been considered by the Court, in the case now under consideration, that whatever may be the situation of the pure legal title, that yet as that is held by the Commonwealth, for the benefit of the petitioners, a possession by them, or those claiming under them, is sufficient to protect them against an ouster by a mere intruder, both on them and the Commonwealth, as the patentee of lands, so situated, must-be taken to be.
The Commonwealth may assert her title against the first petitioners, but it must be done in one way, and one way only, to wit: by judgment in favor of a subsequent petitioner. There is no other mode prescribed by law, for affecting them. Until that is done, the first petitioners are in of right, have performed meritorious services, as aforesaid, have little more to perform, and on doing which, they have an undoubted right to call for the legal title. This judgment is a part of their title; and the residue of it can be called little more than a naked, outstanding, satisfied trust for them. Yet, the defendant, without shewing himself such subsequent petitioner, or at all connecting himself with the judgment,, seeks to lay hold of. this outstanding title, and of this judgment, which is part of the plaintiff’s title, to •defend himself by. On the whole, considering the peculiar nature and objects of the law, I am not prepared to say that the decision aforesaid ought to be overruled.
But, if I am wrong in this, it appears to me that the lessors of the plairttiff are protected by the act aforesaid.
It is true, that act passed since the date of Norvell’s patent, and, of course, since his entry.
Had that entry been made since the act, I .presume there would be little doubt, under all the circumstances of this case, that it is one which would come within its purview.
*But, the act did not intend merely to reach and protect against entries made subsequent to the act. It was intended to cover cases where a party, thus holding, has been attempted to be interfered with, by an entry not sanctioned by law. And, I think, that in deciding case's under this act,- we are no more stopped by the patent, because it issued before the act, than if it had issued after the act, on an entry made before. Controversies under this act would not arise, except in case of caveat, until a patent had been obtained, and the title was in issue. In such cases, we must, of necessity, go behind the patent, to see if the entry was lawful, and within the saving of the statute; in the same way that we must go behind the patent,, where both entry and patent are subsequent to the act, in order to see that the entry in that case is since the act, and so not within its saving.
It seems to have been admitted on all hands, that an entry by Treasury Warrant, on lands theretofore patented, was illegal; and that if the patents to Norvell had stated the true situation of this land, and although the Commonwealth might, in this way, have attempted to grant this land, that the patent would have been void on its face; there being no law to justify an entry or location of this land, by Treasury Warrant. We, however, in this case, are not stopped by the patent; and, consequently, as this land was not subject to be taken by a Treasury Warrant, I think the defendants are not within the saving of the statute.
T agree with the Judge who has preceded me, as to the demurrer; and, on the whole, I think the judgment must be affirmed.